IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PRESTON L. SMITH, | ) | CIVIL NO. 10-00587 LEK-BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HILLARY RODHAM CLINTON, | ) | |
| SECRETARY, DEPARTMENT OF | ) | |
| STATE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Hillary Rodham Clinton's ("Defendant") Motion for Summary Judgment ("Motion"), filed on March 15, 2011. Pro se Plaintiff Preston Smith ("Plaintiff") did not respond to the Motion. On June 24, 2011, the Court issued an order vacating the hearing on the Motion, granting the Motion, and informing the parties that it would thereafter issue a written order. After careful consideration of the Motion and the relevant legal authority, Defendant's Motion is HEREBY GRANTED for the reasons set forth below.

**BACKGROUND**

**I.    Factual History**

Plaintiff is a fifty-three-year-old male that self-identifies as both "African American/Black" and "African-American/Caucasian". [EEO Investigative Aff. ("EEO

Aff.") at 1, 31).[1]] Plaintiff claims that he has suffered from "Major Depression with Panic/Anxiety and Agoraphobia Disorder" for over sixteen years. [Id. at 3.]

The United States Department of State ("State Department"), Honolulu Passport Agency ("Agency") hired Plaintiff as a "Passport Specialist" for a probationary, one-year term beginning on October 21, 2007. [CSOF at ¶ 1 (citing Declaration of Joyleen N. Cohen ("Cohen Decl.") at ¶ 3.[2]] During his first couple weeks at the Agency, Plaintiff participated in a work orientation, engaged in classroom study, and received personalized, on-site training. [State Dep't, Evaluation of Probationary Employee for Preston L. Smith ("Emp. Eval."), dated 3/11/08, at 1.[3]] In early December 2007, the Agency sent Plaintiff to the National Passport Center ("NPC") in Charleston, South Carolina for an intensive training program that "is mandatory for all newly hired Passport Specialists." [Id.] According to Plaintiff's first-line supervisor, Joyleen Cohen

---

[1] The EEO Affidavit is attached to Defendant's Concise Statement of Facts in Support of Motion for Summary Judgment ("CSOF") as part of Exhibit 2 (Excerpts of EEO Record of Investigation) to the Declaration of Samuel B. Woodworth. [Filed 3/15/11 (dkt. no. 29-4).]

[2] The Cohen Declaration is attached to the CSOF. [Dkt. no. 29-1.]

[3] The Employee Evaluation is attached to the CSOF as part of Exhibit 1 (Notice of Termination) to the Cohen Declaration. [Dkt. no. 29-2.]

("Cohen"), Plaintiff initially performed as expected following the NPC training. [Id.; Cohen Decl. at ¶ 2.] Supervisors and managers nonetheless continued to review Plaintiff's work and provided him with feedback. [Emp. Eval. at 1; CSOF, Declaration of Steven Mullen ("Mullen Decl.") at ¶ 9.]

In January 2008, Agency supervisors started identifying "omissions and errors" in Plaintiff's work. [Emp. Eval. at 1.] Plaintiff's supervisors confronted him about these problems during a feedback session in mid-January, but he failed to improve his performance. [Id.] "Feedback sheets from February 20, 22, 27 and March 1st show the same frequency and type of problems that were discussed with him in batch review[4] from a month earlier." [Id.] According to Cohen, "[o]ther trainees with even less time on the job . . . showed significantly more improvement and development" over the same time period. [Id.]

On January 31, 2008, Plaintiff contacted the State Department's Office of Civil Rights to report an incident of alleged employment discrimination. [EEO Counselor's Report ("EEO Report"), dated 2/26/08, at 1-2.[5]] Plaintiff reported that, on January 30, 2008, he discovered a note written by his third-line

---

[4] Plaintiff's supervisors assigned him "batches" of passport applications for "adjudication". [Empl. Eval. at 1.] The Agency used batch assignments "to build his skills" as a passport specialist. [Id.]

[5] The EEO Report is attached to the CSOF as part of Exhibit 2 to the Declaration of Samuel B. Woodworth. [Dkt. no. 29-4.]

supervisor, Nancy Finn ("Finn"), in one of his batch assignments that stated: "Joy- this is becoming a waste of my time and your time. And if Preston doesn't can't (sic) get or know how to fix it, then we need to come to some kind of approach to resolve this." [Letter dated 2/1/08 to an unnamed EEO counselor from Preston Smith ("EEO Letter") at 2.[6]] Plaintiff claimed that he confronted Cohen about the note and that Cohen informed him that it was intended for her only. [Id.] Plaintiff further claimed that the incident "made me extremely upset and caused me to have an anxiety attack." [Id.] According to the EEO Report, Plaintiff "needed to be taken by ambulance to the hospital" as a result of his anxiety. [EEO Report at 2.] Cohen claims that Plaintiff did not notify his supervisors, the management, or the Agency's security personnel about the situation. [Emp. Eval. at 1.]

The EEO Letter also claimed that Cohen made "inappropriate sexual advances" towards him on two separate occasions. [EEO Letter at 3.] According to Plaintiff, the first incident occurred in November 2007 when Cohen "took a sit (sic) next to [him] and began a conversation with [him] that made [him] feel uncomfortable because of [their] supervisory relationship." [Id.] Plaintiff claims that the second incident occurred on

---

[6] The EEO Letter is attached to the CSOF as part of Exhibit 2. [Doc. no. 29-4.]

December 21, 2007 when Cohen invited him to her house for a
Christmas dinner.  [Id.]

Finally, the EEO Letter accused an unnamed State
Department security guard of verbal harassment.  According to
Plaintiff, the security guard ridiculed him for not having a
permanent work station and told him to "go back East to New York
City where [he] came from."  [Id.]

EEO counselor Senora Pittman spoke to Plaintiff, Cohen,
and Finn about his grievances and indicated that the parties
elected to engage in alternative dispute resolution ("ADR").
[EEO Report at 5.]  The administrative record does not indicate,
however, whether the parties ultimately participated in an ADR.[7]

On March 5, 2008, Plaintiff refused to meet with Cohen
to discuss his work.  [Emp. Eval. at 1.]  Cohen claims that
Plaintiff stated that "'his work is perfect'" and that "his
batches need not be reevaluated."  [Id.]  Cohen subsequently
observed that Plaintiff: "has repeatedly shown that he is
unwilling to apply the written instructions we give him on his
batch work[;]" "is openly confrontational[;]" and, on several
occasions, "loudly assert[ed] his perfection without regard to
coworkers and/or managers who hear his outbursts."  [Id.]

According to Agency supervisors, Plaintiff was

_____

[7] Plaintiff contends that the parties did not engage in ADR
prior to his termination.  [Complaint at 3.]

adjudicating an inadequate number of passports given both his
training and tenure.  Cohen explained:

> As a trainee at his grade level he is expected to
> complete a minimum of 50-60 applications per day.
> In spite of being assigned to do batch work, his
> personal production reports show that he has
> adjudicated 134 applications in the 9 workdays
> that he was in the office between February 25 and
> March 11th.  He did not complete more than 30
> applications on any single one of those days.

[Id.]  Finn noted that "[o]n or about February 28, 2008, he
ceased to adjudicate any passport applications."  [CSOF,
Declaration of Nancy K. Finn ("Finn Decl.") at ¶ 3.]  Plaintiff's
second-line supervisor, Stephen Mullen, similarly observed that
Plaintiff "virtually stopped doing his job[.]"  [Mullen Decl. at
¶ 13.]

Agency supervisors also reported that Plaintiff acted
inappropriately at work on at least two occasions.  As explained
by Cohen:

> On February 20th he walked over to the workstation
> of a senior specialist who was consulting with one
> of the trainees.  Mr. Smith lingered and then
> placed a large, fake cockroach on top of the
> application being discussed.  Another cockroach
> incident happened with the secretary on February
> 22nd.  Each incident was accompanied by comments
> made by Mr. Smith that were considered
> inappropriate and offensive to the targeted
> employees.

[Emp. Eval. at 1-2.]  Finn received similar reports of such
incidents.  [Finn Decl. at ¶¶ 5b, 5d.]  According to Cohen,
Mullen, and Finn, Plaintiff's behavior had a negative impact on

Agency employees' concentration and productivity. [Emp. Eval. at 1; Cohen Decl. at ¶ 5e; Mullen Decl. at ¶¶ 5-7; Finn Decl. at ¶¶ 5c, 5d.]

In her Employee Evaluation, Cohen recommended against Plaintiff's retention. [Emp. Eval. at 1-2.] Mullen, Finn, and several other Agency officials agreed with Cohen's recommendation. [Mullen Decl. at ¶ 8; Finn Decl. at ¶¶ 6-7; CSOF, Declaration of Matthew S. Klimow ("Klimow Decl.") at ¶ 6.]

On March 17, 2008, the Agency terminated Plaintiff. [Letter from Matthew Klimow to Preston Smith dated March 17, 2008 ("Termination Letter") at 1.[8]] The Termination Letter states, in pertinent part:

> After numerous counseling sessions, you have not demonstrated the necessary customer service skills to perform the duties of your position. You have exhibited an unwillingness to deal with your supervisors and co-workers in a professional manner, on the job and in training sessions, as attached documentation shows. Further, your supervisory chain has lost confidence in your professional abilities and believe it unlikely that you will change your behavior or improve our performance. As such, you have failed to demonstrate fitness for continued employment with the Agency.

[Id.]

---

[8] The Termination Letter is attached to the CSOF as part of Exhibit 1 to the Cohen Declaration. [Dkt. no. 29-2.]

## II. **Procedural History**

### A. **Administrative Proceedings**

On May 7, 2008, Plaintiff filed an equal employment opportunity ("EEO") complaint against the Agency. The complaint alleged that

> the Agency discriminated against him on the bases of race (Multi-racial), disability, age (51), and reprisal for prior protected EEO activity [under Title VII of the Civil Rights Act of 1964] when:
>
> > 1. he was subjected to a hostile work environment; and
> >
> > 2. he did not receive the tools necessary to successfully perform his job, including training, a permanent workspace, and a mentor, which resulted in his termination.

Smith v. Clinton, Appeal No. 0120092002, United States Equal Employment Opportunity Commission ("EEOC"), Office of Federal Operations, dated 08/23/10 ("EEOC Decision"), at 1.[9]

The Agency responded to the EEO complaint by conducting an internal investigation. Upon completion of the investigation, the Agency provided Plaintiff with a copy of its investigative file and informed him of his right to request a hearing before an EEOC administrative judge. When Plaintiff did not request a hearing within the thirty-day window provided by 29 C.F.R. § 1614.108(f), the Agency issued its final decision concluding that

---

[9] The EEOC Decision is attached to the Complaint as Exhibit A. [Dkt. no. 1-1.] Neither party has provided a copy of the original EEO complaint.

Plaintiff failed to prove that it subjected him to discrimination. [Id. at 2-3.[10]]

On April 19, 2009, Plaintiff appealed the Agency's final decision to the EEOC. The Director of the Office of Federal Operations, Carlton Hadden ("Director Hadden"), affirmed the Agency's decision on August 23, 2010. With respect to Plaintiff's hostile work environment claims, Director Hadden concluded that Plaintiff failed to show that:

> (1) he was subjected to unwelcome verbal or physical conduct involving his protected classes; (2) the alleged harassment he complained of was based on his statutorily protected classes; and (3) the alleged harassment had the purpose or effect of unreasonably interfering with his work performance and/or creating an intimidating, hostile, or offensive work environment.

[Id. at 4 (citations omitted).]

With respect to Plaintiff's disparate treatment claims, Director Hadden concluded that Plaintiff "did not establish discrimination based on race, disability, age and/or reprisal with regard to his termination" and that "[t]he Agency has articulated legitimate, nondiscriminatory reason (sic) for terminating [Plaintiff]." [Id. at 4-5.] According to Director Hadden, the Agency's legitimate, nondiscriminatory reasons for terminating Plaintiff included his unwillingness to take directions from supervisors, his failure to demonstrate skills in

---

[10] The Court notes that neither party has provided a copy of the Agency's final decision.

the area of customer service, and his unprofessional behavior

towards coworkers.  [Id. at 4.]  Director Hadden informed

Plaintiff of his right to file a civil action within ninety days

of receiving the EEOC Decision.  [Id. at 6.]

### B.  District Court Proceedings

On October 7, 2010, Plaintiff timely filed his

Employment Discrimination Complaint ("Complaint") with this

district court.  The Complaint appears to allege that the Agency

violated Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e et seq., by: (1) subjecting him to a hostile

work environment on account of his disabilities; (2) failing to

provide him with the proper training and resources to do his job

on account of his disabilities; and (3) wrongfully terminating

him on account of his disabilities.  [Complaint at 2-3.]

While Plaintiff does not explicitly present race, sex,

or age discrimination claims in his Complaint, the Court

liberally construes Plaintiff's Complaint as incorporating such

claims by reference.  See Haines v. Kerner, 404 U.S. 519, 520-21

(1972) (per curiam) (observing that a pro se litigant's pleadings

must be read more liberally than pleadings drafted by counsel);

see also Williston Basin Interstate Pipeline Co. v. An Exclusive

Gas Storage Leasehold & Easement in the Cloverly Subterranean

Geological Formation, 524 F.3d 1090, 1096 (9th Cir. 2008)

(finding that, for the purposes of a motion to dismiss, a court

may consider not only the "allegations contained in the pleadings" but also "exhibits attached to the complaint" (citation omitted)).  Plaintiff attached a copy of the EEOC Decision – which reviewed allegations of discrimination on the bases of disability as well as race, sex, and age – to his Complaint.  The incorporated discrimination claims implicate Title VII, the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 791 et seq., and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. Further, Defendant addressed Plaintiff's race, sex, and age discrimination claims in the instant Motion.  As a result, the Court will consider Plaintiff's three claims – hostile work environment, disparate treatment, and wrongful termination – with respect to all four bases of discrimination: race, disability, sex, and age.

On December 29, 2010, Defendant filed an answer to the Complaint admitting that the Agency formerly employed Plaintiff. [Dkt. no. 18.]  Defendant denied the remainder of Plaintiff's allegations.

## III. **Motion for Summary Judgment**

Defendant argues that she is entitled to summary judgment on all of Plaintiff's claims because: (1) the disability and race claims fail because his supervisors were unaware of his race or disabilities; (2) the hostile work environment claims

11

fail because he cannot establish severe and pervasive harassment, or any kind of harassment based on race, disability, sex, or age; (3) the disparate treatment claims fail because he cannot establish a *prima facie* case of disparate treatment, and because the Agency had legitimate, nondiscriminatory reasons for its actions; and (4) the wrongful termination claims fail because he cannot establish a *prima facie* case of wrongful termination, and because the Agency had legitimate, non-discriminatory reasons for terminating Plaintiff.

###    A.    Plaintiff's Race- and Disability-Based Claims

Defendant argues that all of Plaintiff's race- and disability-based claims fail because his supervisors were unaware of his race or alleged disabilities. Defendant explains that, to state a claim of race and disability discrimination under Title VII and the Rehabilitation Act, respectively, a plaintiff must establish that the alleged discrimination was suffered because of his or her membership in a protected class. [Mem. in Supp. of Motion at 9 (citing 42 U.S.C. § 2000e-2(a)(1); Walton v. U.S. Marshals Serv., 492 F.3d 998, 1005 (9th Cir. 2007)).] Defendant argues that Plaintiff "will be unable to show that this (sic) supervisors were even aware of his race and disability, much less that they harassed or discriminated against him on the basis of those protected characteristics." [Id.]

**B.  Plaintiff's Hostile Work Environment Claims**

Defendant argues that Plaintiff's hostile work
environment claims fail because he cannot establish a *prima facie*
case that he suffered harassment, much less "severe and pervasive
harassment", based on his race, disability, sex, or age.  [Id. at
10.]  Defendant contends that "nothing in the specifics of the
verbal or physical conduct alleged by plaintiff and recounted in
the Concise Statement of Facts even suggests that it was done on
the basis of Plaintiff's race, sex, age, or disability."  [Id.]

Defendant identifies two alleged instances of
harassment in Plaintiff's filings.  The first instance of
harassment concerns a statement by "Mr. CAD", a State Department
security guard, to Plaintiff that "he should go back to New York
because there were already too many people from the East Coast in
Hawai`i."  [Id. at 10-11 (citing CSOF at ¶ 4).]  Defendant
contends that the security guard's statement does not support
Plaintiff's hostile work environment claims because it "has
nothing to do with Plaintiff's race, sex, age, or claimed
disabilities of depression and anxiety."  [Id. at 11.]

The second alleged instance of harassment concerns
Cohen's "attempt to engage in small-talk with plaintiff over
lunch, and her undesired invitation to her family's Christmas
dinner[.]"  [Id. (citing CSOF at ¶ 4).]  Defendant argues that
nothing about these acts suggests that they were motivated by

13

Plaintiff's race, disability, sex, or age.  [Id.]

Defendant argues that, even assuming, *arguendo*, that Plaintiff could produce evidence of harassment based on a protected characteristic, such harassment would qualify as neither severe nor pervasive.  [Id. at 12.]  Defendant argues that "[a] few allegedly improper comments by a security guard on the basis of plaintiff's residency in New York City plainly do not amount to discriminatory changes in the terms and conditions of employment."  [Id. at 13 (citation and internal quotation marks omitted).]  Defendant further contends that "Cohen's gestures in the cafeteria, or with respect to her Christmas dinner," do not constitute "'severe or pervasive' acts of sex discrimination."  [Id.]

Defendant argues, moreover, that "the alleged instances of 'harassment,' taken together," do not "yield even a modest inference of discrimination."  [Id.]  According to Defendant, "the Ninth Circuit has held far more serious workplace language or conduct insufficient to defeat judgment as a matter of law for the employer in hostile work environment cases."  [Id.]

**C.** **Plaintiff's Disparate Treatment Claims**

Defendant argues that Plaintiff's disparate treatment claims fail because he is unable to establish a *prima facie* case that the Agency provided similarly-situated employees with training, resources, or opportunities that it did not provide to

14

Plaintiff.  Defendant further argues that the Agency had legitimate, non-discriminatory reasons for its decisions affecting Plaintiff.

First, Defendant argues that there is no evidence suggesting that the Agency denied Plaintiff training given to similarly-situated employees who were not members of Plaintiff's protected classes.  [Id. at 15 (citing CSOF at ¶¶ 6-11).] According to Defendant, "[o]ther than a black employee named 'Ted' who plaintiff claims received a mentor, plaintiff has not identified any employees who received anything he claims to have been denied."  [Id.]  Moreover, Defendant contends that, "since both Ted and plaintiff are African-American males, Ted does not qualify as a valid comparator, except possibly with regard to plaintiff's claimed disability, which lacks even the faintest connection to plaintiff's lack of a mentor."  [Id.]

Second, Defendant argues that the Agency's equal treatment of all employees due to its time, space, and resource limitations "provides a legitimate, nondiscriminatory, and indeed obvious explanation for the allegedly wrongful conduct identified by plaintiff."  [Id.]  Defendant contends that Plaintiff received identical training and resources as other passport specialist trainees.  [Id. at 16 (citations omitted).]

Finally, Defendant argues that Plaintiff's allegation that the Agency discriminated against him by failing to assign

15

him a personal mentor also fails.  Defendant explains that, due
to staffing constraints, none of the trainees were assigned
permanent mentors.  [Id. at 16 n.4 (citing Finn Decl. at ¶¶
17-18; Cohen Decl. at ¶ 18).]  Defendant contends that
Plaintiff's claim that the Agency assigned a fellow trainee,
Ted Palmer, a mentor is incorrect.  According to Defendant,
Ted Palmer "merely sat next to a slightly more experienced
individual, Sean Ballentyne, who was available to answer
Mr. Palmer's procedural questions. . . .  There was no formal
mentor relationship between Mr. Palmer and Mr. Ballentyne, and
Mr. Ballentyne did not review any of Mr. Palmer's work."  [Id.
(citing Cohen Decl. at ¶ 18).]  Moreover, "Mr. Ballentyne and
others, including Ms. Cohen, were equally available to answer
plaintiff's questions."  [Id. (Cohen Decl. at ¶ 18).]

   D.  **Plaintiff's Wrongful Termination Claims**

        First, Defendant argues that Plaintiff was not
performing his job well enough to rule out the possibility that
he was terminated for poor performance.  Although Plaintiff had
"more than sufficient time in January and February 2008 to learn
and apply the procedures for adjudicating passport
applications[,]" and "frequent attempts were made to assist
plaintiff in improving his performance, his work consistently
contained the same types of omissions and errors as were
discussed during his early feedback sessions."  [Id. at 17-18

(citing Cohen Del. at ¶¶ 5a, 5b, 5d, 15, 16; Finn Decl. at ¶¶ 11-13; Mullen Decl. at ¶ 3; EEO Aff. at 1, 3).] In addition, Defendant argues that Plaintiff adjudicated applications at a rate far lower than the Agency expected of him given his tenure. According to Defendant, Plaintiff was completing as few as two applications per day while other trainees with equivalent tenure were averaging fifty to sixty applications per day. [Id. at 18 (citing Finn Decl. at ¶ 3).] Defendant claims that, as of late February 2008 or early March 2008, Plaintiff stopped adjudicating passports altogether. [Id. (citing Finn Decl. at ¶ 3; Emp. Eval. at 1; Mullen Decl. at ¶ 13).]

Second, Defendant argues that "Plaintiff showed little or no respect for his superiors, including their experience and knowledge, and refused to take feedback from them, claiming that his work was 'perfect.'" [Id. (citing Cohen Decl. at ¶¶ 5a, 5b, 16; Finn Decl. at ¶ 4; Mullen Decl. at ¶¶ 5, 13).] Defendant claims that Plaintiff told Cohen that, for undisclosed reasons, he did not feel comfortable with her evaluating his work, and Plaintiff ultimately refused to let her evaluate it. [Id. at 18-19 (citing Cohen Decl. at ¶ 16).] Defendant also claims that Plaintiff was argumentative, questioning "virtually everything that came from his superiors[,]" and "took to shouting at the managers on multiple occasions." [Id. at 19 (citing Cohen Decl. at ¶¶ 5c, 5e, 16; Mullen Decl. at ¶¶ 5, 7, 13; Finn Decl. at ¶

17

2).]

Finally, Defendant argues that Plaintiff "engaged in highly disruptive and disturbed behavior in the workplace, causing other employees to fear for their safety." [Id.] Defendant claims that Finn received multiple complaints about Plaintiff's behavior from his coworkers, some of whom "no longer felt safe at work as a result of plaintiff's presence." [Id. (citing Finn Decl. at ¶¶ 5a-e).]

In summary, Defendant argues that the facts prevent Plaintiff from establishing a *prima facie* case of discrimination and provide legitimate, nondiscriminatory explanations for Plaintiff's termination. [Id.]

## STANDARDS

### I. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

As explained by this district court in Rodriquez v. General Dynamics Armament & Technical Products, Inc.:

> Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See Celotex [Corp. v. Catrett], 477 U.S. [317,] 323 [(1986)]. A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210

18

F.3d 1099, 1102 (9th Cir. 2000).  The burden
initially falls on the moving party to identify
for the court "those portions of the materials on
file that it believes demonstrate the absence of
any genuine issue of material fact."  T.W. Elec.
Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809
F.2d 626, 630 (9th Cir. 1987) (citing Celotex
Corp., 477 U.S. at 323).  "A fact is material if
it could affect the outcome of the suit under the
governing substantive law."  Miller [v. Glenn
Miller Prods., Inc.], 454 F.3d [975,] 987 [(9th
Cir. 2006)].

    When the moving party fails to carry its
initial burden of production, "the nonmoving party
has no obligation to produce anything."  In such a
case, the nonmoving party may defeat the motion
for summary judgment without producing anything.
Nissan Fire, 210 F.3d at 1102-03.  On the other
hand, when the moving party meets its initial
burden on a summary judgment motion, the "burden
then shifts to the nonmoving party to establish,
beyond the pleadings, that there is a genuine
issue for trial."  Miller, 454 F.3d at 987.  This
means that the nonmoving party "must do more than
simply show that there is some metaphysical doubt
as to the material facts."  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986) (footnote omitted).  The nonmoving
party may not rely on the mere allegations in the
pleadings and instead "must set forth specific
facts showing that there is a genuine issue for
trial."  Porter v. Cal. Dep't of Corr., 419 F.3d
885, 891 (9th Cir. 2005) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).
"A genuine dispute arises if the evidence is such
that a reasonable jury could return a verdict for
the nonmoving party."  California v. Campbell, 319
F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred
Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000)
("There must be enough doubt for a 'reasonable
trier of fact' to find for plaintiffs in order to
defeat the summary judgment motion.").

    On a summary judgment motion, "the nonmoving
party's evidence is to be believed, and all
justifiable inferences are to be drawn in that
party's favor."  Miller, 454 F.3d at 988

(quotations and brackets omitted).

696 F. Supp. 2d 1163, 1176 (D. Hawai`i 2010) (some citations omitted).

As further explained by this district court in <u>Aqa v. Winter</u>:

> When a motion for summary judgment is unopposed, the motion should be granted only when the movant's papers are themselves sufficient to support the motion and they do not reveal a genuine issue of material fact. <u>In re Rogstad</u>, 126 F.3d 1224, 1227 (9th Cir. 1997) (noting that it is in error to grant a motion for summary judgment simply because the opponent failed to oppose the motion); <u>Cristobal v. Siegel</u>, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994) (noting that an unopposed motion may be granted only after the court determines that there are no material issues of fact).

> Additionally, in a motion for summary judgment, "material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party." L.R. 56.1(g) (effective Dec. 1, 2009). Thus, while this court is not permitted to grant an unopposed motion for summary judgment as a matter of right, <u>Siegel</u>, 26 F.3d at 1494-95, it must deem all facts proffered in [the defendant's] concise statement as admitted by [the plaintiff]. Therefore, the court must determine whether the facts, as asserted in [the defendant's] concise statement, warrant a grant of summary judgment.

Civ. No. 08-00509 SOM/LEK, 2009 WL 4406086, at *2-3 (D. Hawai`i Dec. 1, 2009) (some alterations in original).

## II. <u>Framework for Employment Discrimination Claims</u>

The Court follows the framework established in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), for Title

VII, Rehabilitation Act, and ADEA discrimination claims.

> McDonnell Douglas Corp. v. Green, 411 U.S.
> 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),
> provides a "useful tool at the summary judgment
> stage" in addressing Title VII claims. See
> McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122
> (9th Cir. 2004). Under this framework, Plaintiff
> has the initial burden to establish a prima facie
> case of discrimination. E.E.O.C. v. Boeing Co.,
> 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and
> quotation omitted). "The requisite degree of
> proof necessary to establish a *prima facie* case
> for Title VII . . . on summary judgment is minimal
> and does not even need to rise to the level of a
> preponderance of the evidence." Cordova v. State
> Farm Ins. Cos., 124 F.3d 1145, 1148 (9th Cir.
> 1997) (citation omitted).

Hughes v. Mayoral, 721 F. Supp. 2d 947, 957 (D. Hawai`i 2010)

(alteration in original); see also Rose v. Wells Fargo & Co., 902

F.2d 1417, 1420 (9th Cir. 1990) (applying the McDonnell Douglas

framework to an ADEA claim); Kim v. Potter, Civil No. 05-00332

JMS/LEK, 2008 WL 483596, at *11 (D. Hawai`i Feb. 22, 2008)

(citations omitted) (applying the McDonnell Douglas framework to

a Rehabilitation Act claim).

A *prima facie* case under McDonnell Douglas generally

requires a plaintiff to offer proof that: (1) he belongs to a

protected class;[11] (2) he performed his job adequately or

_____

[11] For disability discrimination claims, a plaintiff may
satisfy this requirement by showing that he was "regarded as"
having a disability. See Coons v. Sec'y of the U.S. Dep't of the
Treasury, 383 F.3d 879, 884 (9th Cir. 2004) (citations omitted)
(explaining that an individual qualifies as "disabled" under the
Rehabilitation Act "if that individual (1) has a physical or
mental impairment that substantially limits one or more of the
(continued...)

satisfactorily; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who do not belong to the same protected class were treated differently. <u>McDonnell Douglas</u>, 411 U.S. at 802 (footnote omitted); <u>See, e.g.</u>, <u>Noyes v. Kelly Servs.</u>, 488 F.3d 1163, 1168 (9th Cir. 2007) (citation omitted); <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1028 (9th Cir. 2006) (citation and footnote omitted).

> After a plaintiff establishes a prima facie showing of discrimination, the burden under the <u>McDonnell Douglas</u> framework shifts to a defendant to put forward a legitimate, non-discriminatory reason for its actions. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802, 93 S. Ct. 1817. A defendant's burden to articulate some legitimate, nondiscriminatory reason for the challenged action is merely a burden of production, not persuasion. <u>Chuang v. Univ. of Cal. Davis Bd. of Trs.</u>, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If a defendant puts forth a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the given reason is merely pretext for a discriminatory motive. <u>Boeing Co.</u>, 577 F.3d at 1049 (citation and quotation omitted).

<u>Hughes</u>, 721 F. Supp. 2d at 957.

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." <u>Hawn v. Exec. Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1158 (9th Cir. 2010) (citations omitted). That is, "[c]ircumstantial evidence of pretext must be specific and

---

[11](...continued)
individual's major life activities; (2) has a record of such an impairment; or (3) *is regarded as having such an impairment*" (emphasis added)).

substantial[,]" see Becerril v. Pima Cnty. Assessor's Office, 587 F.3d 1162, 1163 (9th Cir. 2009) (per curiam) (some alterations in original) (citation and internal quotation marks omitted), and a plaintiff must do more than merely deny the credibility of the defendant's proffered reason, see Schuler v. Chronicle Broad. Co., 793 F.2d 1010, 1011 (9th Cir. 1986) (citation omitted). "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." Vasquez v. Cnty. of L.A., 349 F.3d 634, 641 (9th Cir. 2003) (footnote omitted); see also Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094–95 (9th Cir. 2005). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan, 413 F.3d at 1095 (citations omitted). "Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination." Id.

> Despite this "useful tool" of the McDonnell Douglas framework, there is nothing that "compels the parties to invoke the McDonnell Douglas presumption." McGinest, 360 F.3d at 1122. "When responding to a summary judgment motion . . . [the plaintiff] may proceed by using the McDonnell Douglas framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007) (quoting McGinest, 360 F.3d at 1122). If the plaintiff submits direct or circumstantial evidence, "a triable issue as to the actual

motivation of the employer is created even if the evidence is not substantial." <u>Id.</u> (quoting <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1221 (9th Cir. 1998)).

<u>Hughes</u>, 721 F. Supp. 2d at 957-58 (alterations in original).

**DISCUSSION**

**I.   Race and Disability Discrimination Claims**

Defendant argues that Plaintiff's race discrimination claims under Title VII and his disability discrimination claims under the Rehabilitation Act fail because his supervisors were unaware of his race or alleged disabilities. Defendant claims that "[a]ll three of his direct line supervisors and the terminating official were either unaware of his race, or believed he was Caucasian, possibly of Italian descent." [CSOF at ¶ 2 (citing Cohen Decl. at ¶ 7; Mullen Decl. at ¶ 12; Finn Decl. at ¶ 8; Klimow Decl. at ¶ 8).] Defendant similarly claims that his supervisors were unaware of Plaintiff's claimed disabilities – depression and agoraphobia:

> Plaintiff's first line supervisor, Ms. Cohen, was not aware of any disability, other than plaintiff's sensitive stomach and blood pressure issues; his second line supervisor, Mr. Mullen, had no knowledge of any disability; and plaintiff's third line supervisor, Ms. Finn, was unaware of any medical condition affecting plaintiff until February 2008, when he submitted a statement from his physician to support his use of emergency sick leave.[12]

---

[12] The Court notes that Plaintiff's use of emergency sick leave did not put Agency officials on notice of Plaintiff's

(continued...)

24

[Id. at ¶ 3 (citations omitted).]  Defendant notes that Plaintiff

declined to self-report any disabilities in his initial hiring

paperwork for the Agency.  [Id. (citation omitted); CSOF, Finn

Decl., Exh. 3 (Pltf.'s Standard Form 256, Self-Identification of

Handicap) at 1.]

Under Title VII, it is unlawful "to fail or refuse to

hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such

individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  To

establish a *prima facie* case of race discrimination under Title

VII, a plaintiff must show, *inter alia*, that the discrimination

suffered was on account of his or her race.  See, e.g., Beck v.

United Food & Commercial Workers Union, Local 99, 506 F.3d 874,

882 (9th Cir. 2007).

The Rehabilitation Act provides the exclusive remedy

for federal employees claiming discrimination based on a

disability.  Johnston v. Horne, 875 F.2d 1415, 1420 (9th Cir.

1989) (citation and footnote omitted), overruled on other

grounds, Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990).

To state a *prima facie* case under the Rehabilitation Act, a

---

¹²(...continued)
alleged disabilities.  Plaintiff himself observes that he was
advised, presumably by his supervisors, "to take some sick time
off because of job-related illness[.]"  [EEO Aff. at 4.]

plaintiff must demonstrate, *inter alia*, that the discrimination suffered was on account of his or her disability. <u>See, e.g.</u>, <u>Walton v. U.S. Marshals Serv.</u>, 492 F.3d 998, 1005 (9th Cir. 2007) (citation omitted).

Since Defendant's CSOF was not controverted, all "material facts" set forth in the document are deemed admitted. <u>See</u> Local Rule LR56.1(g). The Ninth Circuit has defined a material fact as "[a] fact . . . [that] could affect the outcome of the suit under the governing substantive law." <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d 975, 987 (9th Cir. 2006) (citation omitted). The Court finds that the CSOF's statements that the Agency supervisors were unaware of Plaintiff's race and alleged disabilities are "material facts" because the supervisors' awareness of his membership in said protected classes is critical to proving discrimination under both Title VII and the Rehabilitation Act. As a result, the Court deems Plaintiff to have admitted that his direct-line supervisors, Cohen, Mullen, and Finn, and the terminating official, Klimow, were unaware of Plaintiff's race throughout his tenure at the Agency. The Court further deems Plaintiff to have admitted that all of Plaintiff's direct-line supervisors were unaware of Plaintiff's alleged disabilities during his tenure at the Agency.

The CSOF does not indicate whether Klimow was aware of Plaintiff's alleged disabilities prior to his termination. In

his Complaint, Plaintiff alleges that his "[e]mployer knew that I had a disability prior to termination[,]" but he offers no evidence in support of this allegation. [Complaint at 2.] Moreover, none of the exhibits attached to his Complaint indicate that Klimow was aware of his claimed disabilities.

In his EEO Affidavit, Plaintiff claimed that, in early February 2008, he provided the Agency with documentation identifying his alleged disabilities. [EEO Aff. at 4.] Specifically, Plaintiff claimed that he informed "security personnel" that he experienced a panic attack at work and was going to Queens Hospital for psychiatric help. [Id.] When asked to identify the individuals who received documentation about his alleged disabilities, he exclusively identified Cohen. [Id. at 5.] This Court has already found that Plaintiff's direct-line supervisors, including Cohen, were unaware of his alleged disabilities. The Court further notes that Plaintiff has not furnished any documentation regarding his mental health problems. The only medical document attached to Plaintiff's Complaint is a letter from Dr. Mohamed M. Aboyoussef, a doctor in Straub Hospital's Rheumatology Department, stating that Plaintiff "is under [his] professional care for severe pain, and severe osteoarthritis of the knees." [Complaint, Exh. B (Letter dated 10/5/10 to Preston Smith from Dr. Mohamed M. Aboyoussef) at 1.]

Summary judgment must be granted against a plaintiff

that fails to demonstrate facts to establish what will be an essential element at trial.  <u>Celotex</u>, 477 U.S. at 323.  Since Plaintiff provides no evidence that Klimow or his supervisors were aware of his race or alleged disabilities, the Court FINDS that Plaintiff has failed to establish an essential element of his race and disability discrimination claims: that the relevant authorities were aware of his race or alleged disabilities. Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's Title VII race discrimination claims for hostile work environment, disparate treatment, and wrongful termination.  The Court further GRANTS Defendant's Motion as to Plaintiff's Rehabilitation Act disability discrimination claims for hostile work environment, disparate treatment, and wrongful termination.

## II. <u>Remaining Hostile Work Environment Claims</u>

Defendant argues that Plaintiff's hostile work environment claims fail because he cannot establish a *prima facie* case of harassment, much less severe and pervasive harassment, based on his membership in a protected class.  According to Defendant, none of Plaintiff's allegations even suggests that he was harassed due to his race, disability, sex, or age.

Plaintiff makes the general allegation that his "[e]mployer knew that I was was (sic) in a hostile work environment."  [Complaint at 2.]  The Complaint fails to identify, however, any specific instances of discrimination

creating a hostile work environment.

The Court observes that, during the administrative stage of this case, Plaintiff made more detailed allegations in support of his hostile work environment claims. As summarized by Director Hadden:

> In support of his hostile work environment claim, Complainant stated that a security guard (SG) made inappropriate remarks to him about being from the east coast and ridiculed him for not having a permanent workspace. (S2), another manager, stated that her supervisor (S3) met with SG's supervisor after becoming aware of the situation. S3 stated that he instructed the guard crew to refrain from making offensive comments to Complainant. Complainant also contends that he discovered a note from S2 while reviewing one of his batches. The note stated that S2 and S1 needed to find a solution to the problems associated with Complainant's work. [Plaintiff's supervisor,] S1 stated that she told Complainant that the note was meant for her, and that the note indicated that S1 needed to find a better way to train Complainant. Complainant also mentioned an incident in which another employee (E1) sent him an email stating that she wanted him to stop bothering her at work. Complainant responded to this email and S3 verbally reprimanded him for doing so. S3 stated that he discussed the issue with E1 and reprimanded her for sending the initial email as well. S3 avers that he did not discipline or threaten discipline to either employee over the incident.
>
> Lastly, although he did not allege discrimination based on sex in his formal complaint, Complainant claims that S1 made inappropriate sexual advances toward him. Complainant relates two instances in which he states this occurred. During the first instance Complainant claims that S1 followed him to the cafeteria and, without his permission, sat down at his table and started a conversation with him. S1 states that she was in the cafeteria and saw Complainant while she was looking for an empty

table.  S1 states that she eats lunch with many of
her employees, especially those new to the island.
Complainant states that on another occasion S1
invited him to her house for Christmas dinner.  S1
stated that she invited all of the trainees as
well as approximately fifty (50) of her friends
and family members.  S1 stated that she often
invites employees and coworkers with no family on
the islands as it is a local custom.

[EEOC Decision at 2.]

Since the Court has already granted summary judgment in
favor of Defendant with respect to all of Plaintiff's race and
disability discrimination claims, the Court will only consider
Plaintiff's hostile work environment claims that concern sex and
age discrimination.

**A.    Title VII Hostile Work Environment Claim**

To assert a hostile work environment claim under Title
VII on the basis of sex, a plaintiff must make a *prima facie*
showing: "(1) that he was subjected to verbal or physical conduct
of a . . . sexual nature; (2) that the conduct was unwelcome; and
(3) that the conduct was sufficiently severe or pervasive to
alter the conditions of the plaintiff's employment and create an
abusive work environment."  Vasquez v. Cnty. of L.A., 349 F.3d
634, 642 (9th Cir. 2003) (footnote omitted).  As explained by
this district court in Abbey v. Hawaii Employers Mutual Insurance
Co.:

Whether conduct was sufficiently severe or
pervasive to violate Title VII turns on "all the
circumstances, including the frequency of the
discriminatory conduct; its severity; whether it

30

> is physically threatening or humiliating, or a
> mere offensive utterance; and whether it
> unreasonably interferes with an employee's work
> performance." <u>Vasquez v. Cnty. of L.A.</u>, 349 F.3d
> 634, 642 (9th Cir. 2003).

Civil No. 09-000545 SOM/BMK, 2010 WL 4273111, at *4 (D. Hawai`i

Oct. 10, 2010).

Plaintiff claims that he experienced "inappropriate

sexual advances" on two occasions. [EEO Letter at 3.] In, the

first instance, Cohen allegedly followed Plaintiff into the

cafeteria and, without permission, sat down at his lunch table.

[<u>Id.</u>] According to Plaintiff, they engaged in a conversation

"that made [him] feel uncomfortable because of [their]

supervisory subordinate relationship." [<u>Id.</u>] The second

instance concerns Cohen's invitation to her Christmas dinner.

Plaintiff claims that the invitation "made [him] feel confused

and uncomfortable since prior to this date she was not training

[him] correctly and talking to [him] in a very disrespectful tone

in front of [his] coworkers about minor mistakes and treating

[him] differently as compare (sic) to [his] other colleagues."

[<u>Id.</u>]

As the Supreme Court explained in <u>Oncale v. Sundowner</u>

<u>Offshore Services, Inc.</u>, "[w]hatever evidentiary route the

plaintiff chooses to follow [in establishing a hostile work

environment claim based on sexual harassment], he or she must

always prove that the conduct at issue was not merely tinged with

31

offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" 523 U.S. 75, 81 (1998) (some alterations in original) (emphasis in original). Moreover, "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 80 (citation and quotation marks omitted). While Plaintiff used the phrase "inappropriate sexual advances" to describe Cohen's conduct, he failed to explain why such interactions, which appear devoid of both sexual content and connotation, were "verbal or physical conduct of a . . . sexual nature[.]" See Vasquez, 349 F.3d at 642 (footnote omitted). Even assuming, *arguendo*, that her conduct could be construed as sexual in nature, Plaintiff failed to show how these isolated interactions constituted or resulted in discrimination on the basis of sex.

The Court FINDS that Plaintiff has failed to make a *prima facie* showing that Cohen or any other employee at the Agency subjected him to discrimination on the basis of sex. Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's Title VII hostile work environment claim based on sex discrimination.

**B.    ADEA Hostile Work Environment Claim**

To assert a hostile work environment claim under the

32

ADEA, a plaintiff must meet similar requirements.

Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1109

(9th Cir. 1991) ("A hostile work environment [under both Title

VII and the ADEA] requires the existence of severe or pervasive

and unwelcome verbal or physical harassment because of a

plaintiff's membership in a protected class." (citations

omitted)), superceded by statute on other grounds as recognized

by Dominguez-Curry v. Nev. Trans. Dist., 424 F.3d 1027 (9th Cir.

2005); accord Sai v. H & R Block Enters., Inc., Civil No.

09-00154 SOM/BMK, 2010 WL 520633, at *7 (D. Hawai`i Feb. 11,

2010) (citations omitted). To assert a hostile work environment

claim under the ADEA, a plaintiff must make a *prima facie* case by

demonstrating that "(1) she [or he] was subjected to verbal or

physical conduct based on age[13], (2) this conduct was

unwelcome, and (3) this conduct was sufficiently severe or

pervasive to alter the conditions of her [or his] employment and

to create an abusive working environment." Sai, 2010 WL 520633

at *7 (citing Freitag v. Ayers, 468 F.3d 528, 539 (9th Cir.

2006); Hardage v. CBS Broadcasting, Inc., 427 F.3d 1177, 1187

(9th Cir. 2005)).

The record contains no evidence that the Agency treated

---

[13] To bring a claim under the ADEA, including disparate
treatment and wrongful termination claims, the plaintiff must
show that he was "at least 40 years of age" at the time of the
alleged discrimination. 29 U.S.C. § 631(a).

Plaintiff differently on account of his age.  The Court notes, moreover, that when an EEO investigator asked Plaintiff to explain why he believed age was a factor in his treatment at the Agency, he merely replied that "Mrs. Cohen would always try to gauge my age by asking me privately (During my December 21, 2007 meeting in her office) and in front of Mr. Wilkenson and Ted (Who both had military experience) whether I had any military experience or not."  [EEO Aff. at 6.]

While Plaintiff may have considered some of the aforementioned conduct to be unwelcome, Plaintiff has failed to show that such conduct was "based on [his] age".  See Sai, 2010 WL 520633 at *7 (citations omitted).  Moreover, Plaintiff has failed to demonstrate that said conduct "was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment."  See id. (citations omitted).

The Court FINDS that Plaintiff has failed to establish a *prima facie* case of hostile work environment on the basis of age discrimination.  Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's ADEA claim for hostile work environment.

## III. <u>Remaining Disparate Treatment Claims</u>

Defendant argues that Plaintiff's disparate treatment claims fail because there is no evidence that the Agency denied Plaintiff training or resources given to similarly-situated

employees who were not members of Plaintiff's protected classes. Defendant further argues that the Agency's equal treatment of all employees due to its time, space, and resource limitations provides a legitimate, nondiscriminatory explanation for its allegedly disparate conduct.

Plaintiff alleges that his "[e]mployer never provided [him] with the proper work-space, tools and correct training to do [his] job effectively[,]" and that his "immediate supervisor, Mrs. Joy Cohen admitted to [him] that she failed too (sic) provide [him] the (sic) proper training so [he] could do [his] job effectively." [Complaint at 2.]

The Court observes that, during the administrative stage of this case, Plaintiff made more detailed allegations in support of his disparate treatment claims. In his EEO Affidavit, Plaintiff asserted that he did not receive the necessary training, workspace, and mentorship to successfully perform his job. With respect to training, Plaintiff claimed:

> I was trained by 8 different specialists on how to
> annotate and adjudicate passport application (sic)
> without any consistency from any of them. . . .
> Also, Mrs. Cohen was almost never available for
> consultations to answer job related question
> (sic); she was too busy doing special projects for
> the Director and Deputy Director, plus, she had to
> supervise, answer and training (sic) all new and
> more experienced specialist (sic) who required her
> assistance throughout the day. I had to propose
> to Mrs. Cohen and Mr. Mullen a series of steps to
> help stream-line the training process with some
> consistency, especially for new passport
> specialist (sic).

35

[EEO Aff. at 11.]

Plaintiff described his workspace grievance in the EEO
Affidavit as follows:

> I and two other newly passport specialist
> trainings (sic) were working out of a cold,
> confined training room with very little space to
> organize my work material and work on passport
> apparitions (sic).  We were not part of the main
> work area where the other specialist was assigned.
> After I became Senior Steward at the Honolulu
> passport office I informed Mr. Colin Patrick Walle
> of the horrible working conditions I and the two
> other passport specialists was (sic) working
> under. . . .  I and the other two new specialists
> did not know where we were going to be sitting on
> a daily basis.  We were moved and bounced around
> from other passport specialist work station (sic)
> either while they were on detail, out sick or on
> vacation.  Management, also, had promised me and
> Mr. Wilkerson permanent work stations after we
> completed our training a (sic) NPC after we return
> (sic) in late December 2007.  They then rescinded
> and reneged on their promised (sic) after me and
> Mr. Wilkenson got back in December 2007.

[Id.]

Finally, Plaintiff described his mentorship grievance
in the EEO Affidavit as follows:

> I was not assigned a mentor as promised to me
> after I return (sic) from my NPC training back in
> December 2007: and also, I had requested and
> complain (sic) to my supervisor Mrs. Cohen and
> management after being confused by be (sic)
> training by more than 8 specialist and staff
> members.  I was told that: "We are short on
> staff."  But, Ted (The black specialist) after his
> return from his training at the NPC, he was
> assigned a permanent work station and permanent
> mentor (Sean Bell) too (sic) assist him with any
> question or problems he might experienced (sic)
> while working on his batches and working at the
> Front Counter area with the public, and he had

36

only started a week before I did.

[Id.]

When the investigator asked Plaintiff to explain why his membership in protected classes were factors in the alleged disparate treatment, he referred to his statement regarding his workspace grievance and to unspecified "attachments and referral (sic) from other EEO Counselors and Union President of Local 1998." [Id. at 13.] The Court is unaware of any such documents in the record.

Since the Court has already granted summary judgment in favor of Defendant with respect to all of Plaintiff's race and disability discrimination claims, the Court will only consider Plaintiff's disparate treatment claims that concern sex and age discrimination.

A. **Title VII Disparate Treatment Claim**

To assert a disparate treatment claim under Title VII, a plaintiff must make a *prima facie* showing that:

> (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004) (citations omitted). "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms,

conditions, or privileges of . . . employment.'" Davis v. Team
Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (some alterations
in original) (quoting Chuang v. Univ. of Cal. Davis Bd. of Trs.,
225 F.3d 1115, 1126 (9th Cir. 2000); Kang. v. U. Lim. Am., Inc.,
296 F.3d 810, 818-19 (9th Cir. 2002)). According to the Ninth
Circuit, only "non-trivial" employment actions, such as
"termination, dissemination of a negative employment reference,
issuance of an undeserved negative performance review and refusal
to consider for promotion" qualify as adverse employment actions.
Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000)
(footnote omitted). Assigning more – or more burdensome – work
responsibilities may be an adverse employment action. See Davis,
520 F.3d at 1089-90 (citations omitted). The relocation of a
plaintiff's workspace may also constitute an adverse employment
action where it materially affects the terms, conditions, or
privileges of his employment. See Chuang, 225 F.3d at 1125-26.

The record indicates that the Agency provided Plaintiff
with the same training it provided to other passport specialist
trainees. Plaintiff, similar to the other two passport
specialists hired in October 2007, attended a mandatory training
program at the NPC for all newly-hired passport specialists. In
addition, Plaintiff attended an Agency work orientation, engaged
in classroom study, and received on-site training. Moreover,
throughout Plaintiff's tenure with the Agency, supervisors

reviewed one hundred percent of his work and provided him with ongoing feedback. [Emp. Eval. at 1; Finn Decl. at ¶¶ 11-13; Mullen Decl. at ¶ 9; Cohen Decl. at ¶ 15.] As explained by Finn:

> After the trainee showed proficiency in accomplishing the work with minimal errors and demonstrated process towards meeting the numerical goals of his or her performance elements, he or she was removed from 100% review. Mr. Smith never showed that he had the potential to perform those standards.

[Finn Decl. at ¶ 13.] Finally, Cohen made herself available to Plaintiff as much as possible, meeting with him on several occasions to discuss his performance. [Cohen Decl. at ¶ 16.]

With respect to workspace, the Court finds that the Agency provided Plaintiff with the same type of workspace conditions that it provided to other passport specialist trainees during the time of Plaintiff's employment. When the Agency hired Plaintiff and the two other passport specialists in October 2007, it told them that office renovations prevented the immediate assignment of permanent workspaces. [Finn Decl. at ¶ 14.] They were further advised that, when permanent workspaces became available, they would have the opportunity to move to such workspaces based on their seniority. [Id. at ¶ 15.] Ultimately, space constraints prevented the Agency from assigning Plaintiff a permanent workspace. [Id. at ¶ 16; Cohen Decl. at ¶ 17.] As explained by Finn: "During Mr. Smith's tenure at the Agency, no workstations came available. After November 1, 2007, multiple

passport specialists in our office continued to have no permanent workspace. They remained assigned to small workstations that were designed for contract support staff." [Finn Decl. at ¶ 16.]

With respect to mentorship, the Court finds that the Agency offered Plaintiff the same type of mentor opportunities that it provided to other passport specialist trainees during his tenure at the Agency. During Plaintiff's employment, staffing shortages prevented the Agency from formally assigning a permanent mentor to each trainee. [Finn Decl. at ¶ 18; Cohen Decl. at ¶ 18.] Instead, experienced Agency employees, including Cohen, were available to answer the passport specialist trainees' questions. [Cohen Decl. at ¶ 18.] While Plaintiff alleges that the Agency assigned a mentor to fellow trainee Ted Palmer, that claim appears to be based on nothing more than speculation. As explained by Cohen:

> Although I understand that Mr. Smith believed another trainee (Mr. Palmer) had been assigned a mentor (passport specialist Mr. Ballentyne), there was no formal mentor relationship; rather, Mr. Ballentyne merely sat next to Mr. Palmer and was therefore available to answer procedural questions Mr. Palmer might have. Mr. Ballentyne and others, such as myself, were equally available to Mr. Smith to answer such questions. Mr. Ballentyne did not conduct any review of Mr. Palmer's work.

[Id.]

In summary, the Court FINDS that Plaintiff has failed to show that similarly-situated Agency employees outside of his protected class received more favorable treatment. The Court

40

also FINDS that the Agency had legitimate, non-discriminatory reasons for its training, workspace, and mentorship decisions, and that all passport specialist trainees were provided with similar resources and opportunities.  The Court further FINDS that Plaintiff has failed to show other circumstances that gave rise to an inference of discrimination.  Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's Title VII disparate treatment claim based on sex discrimination.

**B.    ADEA Disparate Treatment Claim**

The analysis for an ADEA disparate treatment claim is similar to that of a Title VII claim.  See <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 888 (9th Cir. 1994) ("We combine the Title VII and ADEA claims for analysis because the burdens of proof and persuasion are the same." (footnote and citations omitted)).  Thus, to assert a disparate treatment claim under the ADEA, a plaintiff must make a *prima facie* showing that: (1) he was at least forty years old; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) he was treated less favorably than a "substantially" younger employee with equal or inferior qualifications.  See <u>id.</u> at 891 (citation omitted).

As explained *supra*, Section III.A., Plaintiff has failed to show that similarly-situated Agency employees outside of any of his protected classes received more favorable treatment

than he did.  Moreover, the record indicates that the Agency acted legitimately and in a nondiscriminatory manner with respect to its training, workspace, and mentorship decisions for passport specialist trainees during Plaintiff's tenure at the Agency. Insofar as Plaintiff has failed to provide any evidence that he was treated less favorably than a substantially younger employee with equal or inferior qualifications, the Court FINDS that Plaintiff has failed to establish a *prima facie* case of disparate treatment on the basis of age discrimination.  Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's ADEA disparate treatment claim.

## IV.  <u>Remaining Wrongful Termination Claims</u>

Defendant contends that the Agency fired Plaintiff for legitimate and nondiscriminatory reasons.  Defendant argues that the "record is replete with evidence that plaintiff's poor performance deteriorated to the point that he stopped adjudicating passport applications altogether, and that his behavior in the workplace was inappropriate, disruptive, and perceived as threatening[.]"  [Mem. in Supp. of Motion at 17.]

Plaintiff offers little support for his wrongful termination claims.  Plaintiff argues in his Complaint that he was illegally terminated because the Agency "knew he had a disability prior to terminating[.]"  [Complaint at 2-3.]  In his EEO Affidavit, Plaintiff claimed that his Notice of Termination

was "filled with lies, false, misleading, and slanderous and libel comments about my work performance and character." [EEO Aff. at 13.] Plaintiff did not specify, however, which statements in his Notice of Termination were false.

Since the Court has already granted summary judgment in favor of Defendant with respect to all of Plaintiff's race and disability discrimination claims, the Court will only consider Plaintiff's wrongful termination claims that concern sex and age discrimination.

## A.   <u>Title VII Wrongful Termination Claim</u>

To assert a wrongful termination claim under Title VII for sex discrimination, a plaintiff must make a *prima facie* showing that:

1.   he was within the protected class;

2.   he was performing his job well enough to rule out the possibility that he was fired for inadequate job performance; and

3.   his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.

<u>Pejic v. Hughes Helicopters, Inc.</u>, 840 F.2d 667, 672 (9th Cir. 1988) (citation omitted).

Plaintiff has not offered any evidence that he was performing his job in a satisfactory manner or that his employer sought a replacement with qualifications similar to his own. Rather, Plaintiff has confessed that, notwithstanding his claimed

43

disabilities, he was not able to perform the required functions and duties of his former position at the Agency. [EEO Aff. at 5.] Thus, Plaintiff has not identified a genuine issue of material fact as to the second and third *prima facie* requirements.

The Court observes, moreover, that Defendant presented evidence that the Agency terminated Plaintiff for legitimate and non-discriminatory reasons and Plaintiff has not identified any contradictory evidence. Agency supervisors reported that Plaintiff was adjudicating as few as two applications per day while other trainees with equivalent tenure were averaging fifty to sixty applications per day and that, by late February 2008 or early March 2008, Plaintiff stopped adjudicating passports altogether. [Emp. Eval. at 1; Cohen Decl. at ¶ 5d; Finn Decl. at ¶ 3; Mullen Decl. at ¶ 13; Klimow Decl. at ¶ 5.]. The record further indicates that, on multiple occasions, Plaintiff was disrespectful to his supervisors, [Cohen Decl. at ¶¶ 5b, 5c; Finn Decl. at ¶¶ 2, 4; Mullen Decl. at ¶¶ 4, 5, 13; Klimow Decl. at ¶¶ 3, 4, 6, 7,] and engaged in disruptive workplace behavior, [Cohen Decl. at ¶¶ 5c, 5e; Finn Decl. ¶¶ 5a-e; Mullen Decl. ¶¶ 2, 5, 7, 13; Klimow Decl. at ¶ 7].

The Court FINDS that Plaintiff has failed to make the requisite *prima facie* showing that: (1) he was performing his job well enough to rule out the possibility that he was fired for

inadequate job performance; and (2) his employer sought a replacement with qualifications similar to his own. Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's Title VII wrongful termination based on sex discrimination.

**B.  ADEA Wrongful Termination Claim**

To assert a wrongful termination claim under the ADEA for age discrimination, a plaintiff must make a *prima facie* showing that he was:

(1) a member of a protected class [age 40-70];

(2) performing his job in a satisfactory manner;

(3) discharged; and

(4) replaced by a substantially younger employee with equal or inferior qualifications.

Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1996) (alteration in original) (citations omitted).

Plaintiff has failed to provide any evidence that he was performing his job in a satisfactory manner. Plaintiff has also failed to show that he was replaced by a substantially younger employee with equal or inferior qualifications. Thus, Plaintiff has not identified a genuine issue of material fact as to the second and fourth *prima facie* requirements. At the same time, as explained *supra*, Section IV.A., the record contains uncontroverted evidence that the Agency fired Plaintiff for legitimate and nondiscriminatory reasons.

The Court FINDS that Plaintiff failed to make the

requisite *prima facie* showing that he: (1) was performing his job in a satisfactory manner; and (2) replaced by a substantially younger employee with equal or inferior qualifications. Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's ADEA claim for wrongful termination.

## CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment, filed on March 15, 2011, is HEREBY GRANTED. The Court GRANTS summary judgment in favor of Defendant on all counts and directs the Clerk of Court to close this case.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, July 29, 2011.



_/s/ Leslie E. Kobayashi_____
Leslie E. Kobayashi
United States District Judge

**PRESTON L. SMITH V. HILLARY RODHAM CLINTON; CIVIL NO. 10-00587 LEK-BMK; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**